Foss, Appellant, vs. Bigelow and others, Respondents.

*February 23 — March 14, 1899.*

*Master and servant: Contributory negligence: Obvious risks.*

In an action for injuries sustained by an employee in a sawmill while
attempting to clear away accumulated sawdust by punching it
through a hole left for that purpose in the floor beneath an edger,
it appeared that he was twenty-nine years of age, and had worked
in the mill two years as a common laborer, and thereafter for some
months had been running a "little trimmer" and had occasionally
taken the place of an edgerman for a few minutes; that at the time
of the injury he was at work on the edger, but had never seen the
accumulated sawdust cleared away; that the saws were uncovered
and making 2,500 revolutions a minute; and that, while standing
above them and trying to remove the dust with a stick four to six
feet long, it was caught and thrown violently upward, breaking
his jaw. *Held*, that the danger was obvious and he was guilty of
contributory negligence.

Appeal from a judgment of the circuit court for Eau Claire
county: James O'Neill, Circuit Judge. *Affirmed*.

For the appellant there was a brief by *Richmond & Smith*,
and oral argument by *T. C. Richmond*.

For the respondents there was a brief by *Tomkins & Mer-
rill*, and oral argument by *Geo. F. Merrill*.

Cassoday, C. J. This action was commenced September 20,
1894, and is for personal injuries received by the plaintiff
while helping to operate an edger in the sawmill of the de-
fendants, August 15, 1891. Issue being joined and trial had,
the court, at the close of the testimony, directed a verdict in
favor of the defendants, and from the judgment entered
thereon the plaintiff brings this appeal.

There is evidence tending to prove that the plaintiff was
hired by the defendants' foreman and general superintend-
ent in the spring of 1888; that he was a common, unskilled

laborer, and had worked in the mill from the time he was so hired until he was injured; that his work until October, 1890, was that of "laying lumber," — that is, standing at the end of the rollers that come from the east edger at the place designated and taking the lumber from the rolls and piling it on the trucks, to be wheeled away by another man; that about October 1, 1890, he was given the job of running the "little trimmer," consisting of one saw at the east side of the mill; that he continued at that work the rest of that season, and from April or May, 1891, when the mill began work, until the time of his injury; that prior to October 1, 1890, he never had had any experience in running an edger or any other machine; that the trimmer was simply a saw located below the table, and operated by taking hold of a handle and drawing it up to cut off the ends of short boards; that the mill was a double mill, with two sets of machinery and men, the one on the east side and the other on the west side; that each side was practically complete in itself, consisting of the rotary saw, gang saws, edger, slab saws or slashers, and trimmers; that to operate this double mill required a large number of men; that the logs were slabbed at the rotary saw, passed through the gang saw, edged at the edger, and passed along the rollers to the trimmer; that the slabs from the rotary went to the slab saws, and were cut into four-foot lengths; that an occasional board from the rotary reached the edger; that from ninety to ninety-nine per cent. of the lumber was cut by the gang saws, and from one to ten per cent. came from the rotary saw; that the mill sawed about 250,000 feet of lumber daily; that if the edgermen failed to get the lumber off the skids as fast as it came down from the gang saws, and it got piled up there, it would be necessary to stop using the gang saws until they got the lumber cleared away; that the operation of the mill depended upon these edgermen keeping the lumber coming from the gang saw clear; that all of the lumber, excepting

slabs, had to go through the edger; that the men employed
to operate each edger were experienced, and each received
$2.65 or $2.75 a day, while the plaintiff only received $1.65
a day; that this work of edging the lumber was so hard
that the edgermen were compelled to change off several times
a day; that the west side of the mill cut the small logs,
making the work of the edgermen much more active; that
the place was noisy; that at different times, when the edger-
men or trimmers had to be away for a few moments, someone
had to take their places; that after the plaintiff commenced
working on the trimmer he was accustomed to do that work
when they were away for a few moments; that these were
the only men he ever "spelled;" that at the edger he al-
ways took the place of the man on the rotary side, and did
nothing except to catch the boards that came from the rotary
saw, and lay them on the edger for the other edgerman to
edge, except that once in a great while the edgerman ad-
justed the saws and he pushed a board through; that prior
to the injury he had never attempted to operate the edger;
that underneath the edger there was a hole cut through the
floor, about one foot wide, which extended from one side to
the other of the edger, through which sawdust was supposed
to fall; that this hole was frequently stopped by edgings
and sawdust piled up underneath the edger, and required
the edgermen to stop and push it down three or four times
a day.

There was also evidence that there were six saws in the
edger, all on a single shaft, and were adjustable by means
of two levers that extended from the front of the edger
where the edgermen stood to the saws; that the levers
crossed one another about the center of the edger; that the
piling up of sawdust under the edger interfered with the
operation of the levers, and thereby with the moving of
the saws; that when this sawdust got piled up under the
edger it had to be removed, and to do that it was the cus-

tom of the edgermen to get up on the edger, and, with a
stick from four to six feet long, poke down around the saws
until they got the sawdust cleared away; that there were
no boards or table on the top of the edger; that in poking
this sawdust down the men had to stand on the levers or
on a board placed on the rollers right over the saws, and
punch the stick in between the saws, and in front of the
saws, and behind the saws; that the edger consisted of five
or six rollers that turned perfectly free, the last one next
to the saws being of iron and known as a "live roller" be-
cause it was moved by cogs or belts; that it had little teeth
on it, which fed the boards through the edger; that above
the "live roller" was another roller that held the boards
down; that between these rollers and the saws were "fin-
gers" or iron points several inches long and about two
inches apart, like rake teeth, so hung as to let the boards
pass under them to the saws for the purpose of preventing
the boards from being thrown back when they struck the
saws; that there was no covering over the saws; that they
were not boxed or in any way protected; that they made
about 2,500 revolutions a minute; that at the time of the
injury the plaintiff knew nothing about the clogging of the
edger by the sawdust, and had never seen the edgermen
poke it down or clear it away when he was "spelling"
them.

The evidence further tended to prove that on the morn-
ing of August 15, 1891, Werner, one of the two edgermen
on the west edger, was taken sick and left, after he had
worked about half an hour, and the foreman told the plaint-
iff to go and help Thompson out,— the edgerman still at
work; that the plaintiff went and took the place of Werner
on the rotary side of the west edger, and continued to work
for about one and one-half hours; that Thompson was taken
sick, and in a few moments Peter Nevera, another green
man, was at work in Thompson's place; that Nevera had

previously been employed in taking lumber from the gang saws and placing it on the skids by the edger, and had no experience in running the edger; that the plaintiff and Nevera continued to run the edger for about half an hour; that they were working very hard; that, in spite of their work, a large pile of lumber had accumulated on the skids; that the levers would not work; that the sawdust had filled up underneath; that the levers worked hard; that Nevera told him to go up and poke the sawdust out; that he told Nevera that he had better go up and do it; that Nevera said, "No; you go up;" that finally the plaintiff got up, and walked on the levers, or the sawdust that had accumulated around them, down near the saws, and, with a stick from four to six feet long, began trying to punch the sawdust down; that the stick he was using struck something and was thrown upward with such violence as to strike him on the point of the chin, breaking his under jaw in three pieces, taking out a portion of the jaw at the front containing three teeth, and otherwise injuring him.

At the time of the trial the plaintiff was thirty-five years of age, and his coworker, Nevera, was thirty-one. That was ten years after the plaintiff had commenced work for the defendants in and about this mill, and about six and one-half years after the injury. The plaintiff was injured August 15, 1891, and he had worked on the "little trimmer" from October 1, 1890. We must assume that he was a man of ordinary intelligence. He necessarily knew that a circular saw, running like the one in question, would be dangerous to a man touching it with a stick from four to six feet long, or anything, and no amount of instruction could make such danger more apparent. To say that he did not know, or that he needed instruction, is to impeach his intelligence. He necessarily knew, moreover, that to touch such saw with such stick, on the side turning away from him, would naturally tend to draw the stick away from him; whereas, to

touch the saw on the side turning towards him, or even on the top, would naturally tend to drive the stick towards him with great force, or, at least, make it dangerous to have hold of it. True, there was sawdust accumulated about the saw. Still, the plaintiff necessarily knew the saw was there and running, and, if he worked there at all, he was bound to regulate his conduct by that fact. Like all such cases, it is hard upon the plaintiff; but, upon the undisputed evidence, we cannot escape the conclusion that his own conduct contributed to the injury. The facts stated are substantially as claimed by counsel for the plaintiff. Of course, every case of personal injury differs in some of its facts from every other; but the principles applicable to a case like this are well settled and require no new discussion. This court has recently held that an employee of mature years, even though inexperienced and uninstructed in the particular business, will be presumed to have known and assumed the risk of an injury incident to obvious defects or dangers, as the unguarded condition of projecting circular saws forming part of the machine at which the employee was set to work, and an accumulation of sawdust, etc., on the floor, although they existed in consequence of the negligence or default of the employer. *Hazen v. West Superior L. Co.* 91 Wis. 208. So, this court has recently held that "an employee in a sawmill, of ten or twelve years' experience, who voluntarily put his hand into a hole in the boxing around a trimmer, and attempted to pick up the end of a broken chain lying within two or three inches of a revolving saw, and was injured by his hand coming in contact with the saw, is held, as a matter of law, to have been guilty of contributory negligence." *Schultz v. C. C. Thompson L. Co.* 91 Wis. 626. To the same effect, *Erdman v. Ill. Steel Co.* 95 Wis. 6. These cases, and numerous others which might be cited, support the ruling of the trial court.

*By the Court.*— The judgment of the circuit court is affirmed.