KERRIGAN, Respondent, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

*September 9 — October 20, 1899.*

*Railroads: Injury to fireman: Contributory negligence: Assumption of risk: Notice of defect.*

1. In an action against a railroad company for injuries sustained by a fireman by being thrown from a moving engine while attending to the headlight by reason of a defective step, the evidence (showing, among other things, plaintiff's previous knowledge of the defect and that it was not necessary for him to use the step at the time of his injury) is *held* to show contributory negligence.

2. It being undisputed that reports of such defects were to be made or notice thereof given to the roundhouse foreman, the fact that plaintiff had requested a boiler repairer to fix the defective step and that the latter did or attempted to do so, did not relieve plaintiff from an assumption of the risk.

APPEAL from a judgment of the circuit court for La Crosse county: O. B. WYMAN, Circuit Judge. *Reversed.*

For the appellant there was a brief by *Losey & Woodward,* attorneys, and *H. H. Field,* of counsel, and oral argument by *Mr. Field* and *Mr. G. M. Woodward.*

For the respondent there was a brief by *Jos. F. Cuddy*, attorney, and *C. L. Hood*, of counsel, and oral argument by *Mr. Cuddy*.

CASSODAY, C. J.   This is an action for damages sustained by the plaintiff while in the employ of the defendant as fireman on engine No. 190, running between La Crosse and Austin, Minnesota, on the evening of February 19, 1897, at Grand Meadow, Minnesota, by reason of a defective step on the front end of the engine. Issue being joined and trial had, the jury returned a verdict in favor of the plaintiff, and assessed his damages at $7,500; and from the judgment entered thereon the defendant brings this appeal.

It is said by the plaintiff's counsel, in effect, that the step consisted of an upright shaft about thirteen inches long, with a circular disc about five and one-half inches in diameter at the upper end, and a shoulder at the lower end, terminating in a stem two inches long and seven eighths of an inch in diameter, provided with a thread extending the entire length thereof, and a seven-eighth-inch nut; that this stem was inserted into and extended through a hole of corresponding size in a sheet-iron deck three sixteenths of an inch in thickness, covering the pilot frame; that there was a washer laid over the hole, on top of the deck and under the shoulder of the shaft, and the stem was fastened on the under side of the deck with the washer below by a nut screwed onto the stem, which, when turned up tight, held the stem firmly in place; that this step had been on the engine a number of years, and was for the use of the fireman in attending the headlight of the engine.

The plaintiff had been fireman on that engine, of which James McLindon was the engineer, for three years prior to the accident, and he testified, as to his familiarity with the step and the manner in which the accident occurred, to the effect that he was at the time of the accident thirty-three

years of age; that his attention was first called to the loose condition of the step five, six, or seven months before he was hurt, at the Austin roundhouse; that in doing his work around the engine he found the step loose; that the truck-man was putting in a pair of trucks, and he was talking with him, and saw that the step was loose, and had him tighten it up; that the next time the engineer found it loose, February 17, 1897, at Houston, Minnesota; that when they got to Rushford he took the step off, and put it on the corner of the tank, and brought it to Austin; that he then reported it, and had it fixed; that he had seen the paper shown him, and in evidence, on the hook in the roundhouse at Austin at the boiler-makers' work bench, and which paper reads as follows: "Report of engine 190. After careful inspection on arrival at Austin, 11:55 a. m., 2—17. Engine in good condition with following exception: Fasten step on front end. Thread is stripped. McLindon, Engineer." Indorsed on back: "Repaired at Austin."

He further testified that the next notice he had that the step was loose was the next morning, in the roundhouse at North La Crosse, February 18, 1897,— the day before he was hurt; that he laid his hand on the step and found it was loose; that he took the wrench, and tightened it up; that he called the attention of the engineer, McLindon, and the roundhouse foreman to it; that the foreman's business was to see that all work reported was done; that he had charge of everything in the roundhouse,— general repairs; that the roundhouse foreman said the step was dangerous in that condition; that he wanted them to either fix it or put in a new one; that he did not fix it; that the plaintiff went and got a wrench and tightened it up; that he next noticed that the step was loose on their outward trip the next day, in the forenoon of February 19, 1897; that he then noticed the step was loose as they were going into the station at Wykoff, about seventy-three miles west of La Crosse, and thirty-nine

miles east of Austin; that it was about 10:55 a. m. when
they arrived at Wykoff; that as they were going into the
station he was sitting on his seat and ringing the bell; that
he saw that the step was wobbling back and forth; that he
told the engineer that the step was loose again; that the
engineer told him to go and take it off, and throw it onto
the tank, the same as he had done on the previous trip, but
that he did not do it; that he thought it was just as well up
there, as he would not have to use the step at all until he
got to Austin; that that was in the daytime; that that was
where the step belonged; that there was no more reason for
the step remaining on there than on the previous time when
the engineer took it off; that it might as well be on the tank
as on the pilot; that the engineer told him to take it off,
but that he did not take it off, but did go out and tighten it,
instead of taking it off as the engineer had told him; that
he went and tightened it up again with his wrench; that
the nut was still on; that when he spoke of the step as hav-
ing got loose at these different times he meant simply that
the nut worked off, so that it did not hold tight against the
plate; that all he had to do was to put the wrench on it,
and tighten it up; that the next he observed anything with
reference to the step was when they got to Austin, on Feb-
ruary 19th; that he guessed the engineer knew that he did
not take it off; that the engineer would assume that he (the
plaintiff) had taken it off, as he had told him to do so; that,
after they got to Austin, he got a wrench himself, off the
engine, as Myers had requested, and held the step while
Myers took off the nut; that the nut was still on, and there
was one or more washers on below the deck plate and one
above; that he did not take the step out of the hole; that
it remained in a standing position; that he did not know
what Myers did, but when he came back he had the washers
in his hand; that the plaintiff held on to that round piece
while Myers started the nut on; that he stayed and held it

while Myers went for more washers, and put some of them on, and that he held it while Myers tightened it; that he did not take it out of the hole at all; that there was nothing he did to the top of it; that the large washer was still on the top; that Myers said he put a jamb nut on,—half a nut; that he did not see him have the jamb nut in his hand; that a jamb nut is one you put on below the original nut, to make it tight,— to lock to, like that; that he did not stay there until Myers finished fixing it; that Myers told him he had tightened it afterwards,— that it would hold; that that was the last time he saw anything done to the step until he was injured; that that was about 4 o'clock in the afternoon of the same day; that he had no occasion to use the step from Wykoff to Austin.

The plaintiff further testified that when they got to Austin he found the step was loose again; that, after the engine was put in the roundhouse, he met Myers, and asked him if he was going to fix the step; that he said he would; that he reported the condition of the step to Myers; that he did that on his own motion,— that no one told him to do it; that Brenaman was roundhouse foreman; that Myers worked in the boiler department, to do the running repairs in the boiler department; that Myers repaired that step that day, when he reported it to him; that it was about 4 o'clock p. m.; that he did not see what Myers did in the repair of the step, but knew what he told him that he did; that he said at the time that he got it tightened up; that he was there when Myers started to put on the step; that he held the step while Myers started to turn the nut on; that the plaintiff was then around and about the engine, part of the time in sight; that after Myers finished it he told plaintiff what he had done; that the plaintiff was then standing right by the side of him; that he put the engine in the roundhouse, and on the evening of February 19, 1897, at 7 or 7:15 p. m., at Austin, he took the engine out of the roundhouse; that the step then

appeared to be all right and solid; that it was solid; that he had occasion to use it when he took the engine out of the roundhouse; that he stepped on it, and lit the headlight; that he stepped on it once afterwards and before the accident at Great Western crossing,— the headlight was burning too high; that that was eighteen or nineteen miles from Grand Meadow, the place of the accident; that when he fixed it they had not come to a full stop; that he went out, and turned.it down a little, but by the time he got it turned down the engine stopped; that when they pulled into Grand Meadow, on the evening of the accident, the headlight was burning very low; that they could not see the rail ahead; that he called the engineer's attention to it before they got into Grand Meadow, and said to the engineer, "When we stop at Grand Meadow, I guess I had better turn up the light a little," and he said, "Yes;" that when he went out to fix it they could not have been going over five or six miles an hour; that he sat on his seat, and rang the bell, until after they had passed the depot door, and opened his cab window, and went out along the running board; that the engine ran about 150 or 175 feet beyond the depot door; that he went out as quick as he could conveniently, along the running board, and put his right foot onto the steam chest, and reached the left foot over onto the step, and reached up to open the slide in the door of the headlight cage; that as he stepped his whole weight onto that step, and reached up to open the trapdoor, the step tipped over, and threw him out, and he fell off on that side and struck on his hip, but did not become unconscious; that when the engine stopped his right foot was under the wheel of the rear engine truck; that that was on the night of February 19th; that on the morning of the 20th he had an amputation.

Assuming that the defendant was negligent in allowing the step to be used in its defective condition, yet we are all clearly of the opinion that the plaintiff was guilty of con-

tributory negligence. The step was a convenience, but not an essential to the running of the engine. According to the plaintiff's own statement, the engine usually stopped 150 or 175 feet beyond the depot at Grand Meadow. He did not open his cab window, and go out along the running board, until after he had passed the depot door. There was no occasion for him to go out at all at that time. He knew all about the troubles he had had with the step during the three days immediately prior to the accident. He voluntarily went out upon the step, when no duty prompted, and with the knowledge of the defects above detailed, and thereby assumed the risk. The principles of law which preclude a recovery in such a case have been adjudicated by this court in cases too numerous to mention. It is unnecessary to repeat them here. Only a few of the more recent are here cited. *Hazen v. West Superior L. Co.* 91 Wis. 208; *Schultz v. C. C. Thompson L. Co.* 91 Wis. 626; *Schiefelbein v. Badger P. Co.* 101 Wis. 402; *Foss v. Bigelow,* 102 Wis. 413; *Roth v. S. E. Barrett Mfg. Co.* 96 Wis. 615; *Leary v. B. & A. R. Co.* 139 Mass. 580. As indicated in the court's charge to the jury, the fact that the plaintiff, without any notice to the roundhouse foreman by the engineer or himself, requested the boiler maker, Myers, to fix the step, and the latter did so or attempted to do so, did not, under the facts or circumstances shown in the case, relieve the plaintiff from the operation of the ordinary rule that an employee assumes the risk of injury from appliances which he knows, or in the exercise of ordinary care might have known, were defective. The plaintiff testified, and it was undisputed, that such reports were to be made, or notice given, to the roundhouse foreman; that no such report was made to the roundhouse foreman at Austin on the day of the injury; that on the day of the injury and while at the station Wykoff, the plaintiff told the engineer that the step was loose again, and that the engineer told him to go out and take it off, and throw it

onto the tank, the same as he had done on the previous trip; that it was his duty to obey the engineer, but that he did not do so, and tightened it himself; and when they got to Austin, instead of reporting the matter to the roundhouse foreman, as he should have done, he conferred with Myers, the boiler maker, with the result stated.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.